## APPEAL OF MEADS COMPANY, INC.

Docket Nos. 816 and 3803.    Submitted August 5, 1925.    Decided October 16, 1925.

1. Sales by a corporation of its capital stock at less than either its par value or its actual value do not create an abnormal condition affecting invested capital under section 327 of the Revenue Act of 1918.

2. Large earnings upon a normal invested capital do not alone entitle a corporation to special assessment under section 328 of the Revenue Act of 1918.

3. Special assessment granted by the Commissioner in prior years, *held* not to entitle corporation to special assesssment in subsequent year.

4. Representative corporations, to be used as comparatives under sections 327 and 328 of the Revenue Act of 1918, need not be similarly circumstanced with respect to prices charged, classes of patrons served, methods of service, or number of branches operated.

5. Taxpayer, operating a chain of dairy lunches, *held* not to have established that its chief competitor was the only corporation comparable with it under sections 327 and 328 of the Revenue Act of 1918.

*Nathan Moran*, Esq., for the taxpayer.
*Ward Loveless*, Esq., for the Commissioner.

Before PHILLIPS, GRAUPNER, and TRAMMELL.

Taxpayer appeals from the determination of deficiencies of $18,216.09 in income and profits taxes for 1918 and $19,964.14 in income and profits taxes for 1919. Taxpayer alleges that for 1918 the Commissioner, although he determined that taxpayer was entitled to special assessment under section 328 of the Revenue Act of 1918, did not compare the taxpayer with representative corporations the invested capital of which can be satisfactorily determined under section 326, and which are as nearly as may be similarly circumstanced with respect to gross income, net income, profits per unit of business transacted, and capital employed, the amount and rate of war profits or excess profits, and all other relevant facts and circumstances as required by section 328. For the year 1919 taxpayer alleges that the Commissioner erred in refusing taxpayer special assessment under sections 327 and 328 of the Revenue Act of 1918.

### FINDINGS OF FACT.

The taxpayer is a California corporation organized in 1909. Its business is the operation of a chain of restaurants, generally described as "dairy lunches," in which customers serve themselves, as distinguished from "service restaurants," in which patrons are served by waiters or waitresses. Its restaurants are known as second-class cafeterias and serve principally laboring men. They are not located on the principal business thoroughfares.

Prices for food served are much lower and portions are larger than in similar restaurants in the East, for which reasons, among others, taxpayer contended that corporations operating similar restaurants in the East could not properly be used as comparatives.

The company was originally incorporated for the purpose of consolidating three restaurants operated by two individuals. Stock of the corporation was issued to the owners for the transfer of such businesses. Between the time of organization and the years involved, taxpayer acquired various restaurants and established others. In June, 1914, the taxpayer acquired the assets, including good will and intangibles, of two allied companies, issuing therefor its own stock to the number of 962½ shares on the basis of 1¼ of its shares for each share of the outstanding stock of the acquired concerns. In June or July, 1914, taxpayer also acquired a restaurant business from one Low, issuing therefor 54 shares of its capital stock. In July, 1914, the taxpayer issued to its own stockholders, pro rata to their holdings, 80 shares of its capital stock for $50 per share. In October, 1918, 392⅝ shares were issued pro rata to its stockholders at $50 per share. The total issued stock after such sale in 1918 amounted to $300,000 par value. Taxpayer's stock had a par value of $100 per share.

During the years 1918 and 1919 taxpayer was operating approximately twenty establishments in San Francisco, Oakland, Stockton, and San Jose. The location and number of restaurants operated has been subject to variation, establishments which failed to pay being closed or sold and new ones being opened from time to time. From 1909 to 1918, ten restaurants were closed or sold.

Monthly dividends at the rate of 6 per cent per annum were paid from January, 1914, to August, 1915, when the rate was raised to 12 per cent. During 1916, no dividends were paid. In January, 1917, 4 per cent was paid, and thereafter dividends were paid monthly at the rate of 6 per cent per annum until September of that year, when the rate was raised to 12 per cent per annum, and increased in March, 1918, to 18 per cent per annum, which continued to May, 1919, after which a monthly dividend was paid at the rate of 12 per cent per annum and so continued to December, 1919.

The Commissioner determined that for 1917 taxpayer was entitled to relief under section 210 of the Revenue Act of 1917, and the tax was computed and paid accordingly. The Commissioner also determined that taxpayer was entitled to assessment for 1918 under sections 327 and 328 of the Revenue Act of 1918, and, on a net income of $72,799.84, determined the profits tax at $34,055.34, or 46.78 per cent of the net income.

For 1919, on a net income of $93,645.84, the Commissioner has determined, under section 302 of the Revenue Act of 1918, a profits tax of $31,155.10, or 33.27 per cent of the net income, refusing to compute the profits tax under sections 327 and 328 of the Act.

During 1918 and 1919, the White Lunch Co., a corporation, was engaged in the business of operating chain restaurants or dairy lunches in San Francisco, Oakland, Seattle, and Tacoma. It was a competitor of the taxpayer, serving the same class of patrons and being practically identical with respect to fixtures, fittings, prices, method of service, etc. Comparisons between the White Lunch Co. and the taxpayer for the years involved have been established as follows, the figures being those determined by the Commissioner:

|  | Net income. | Excess profits tax. | Invested capital. |
|---|---|---|---|
| White Lunch Co.: |  |  |  |
| 1918 | [1] $2,624.21 | None. | Not shown. |
| 1919 | 40,700.98 | $3,683.25 | $241,059.00 |
| Taxpayer: |  |  |  |
| 1918 | 72,799.84 | 34,055.34 | 81,182.22 |
| 1919 | 93,645.84 | 31,155.10 | 101,843.42 |

[1] Loss.

The gross sales of the two companies were as follows:

|  | 1918. | 1919. |
|---|---|---|
| White Lunch Co. | $609,646.29 | $1,056,233.85 |
| Taxpayer | 1,384,913.94 | 1,682,623.49 |

### DECISION.

The determination of the Commissioner is approved.

### OPINION.

PHILLIPS: The first question for consideration is whether the taxpayer has established the existence in 1919 of any of the conditions enumerated in section 327 of the Revenue Act of 1918 as a condition to determination of the profits tax for that year under section 328. It is admitted that the Commissioner computed the tax for 1917 under section 210 of the Revenue Act of 1917 and determined that

the taxpayer was entitled for 1918 to the benefits of sections 327 and 328 of the 1918 Act. The reason for such determination does not appear, except as the deficiency letter for 1919 shows capital stock outstanding of $299,750, against which the Commissioner has deducted, among other items, "stock discount increased $154,263.72." It does appear from the record that substantial amounts of taxpayer's capital stock of the par value of $100 were sold at $50 per share, and that this was less than its actual value. But this creates no abnormality in capital, for the taxpayer is entitled to receive and presumably has received, full credit for the amount actually invested in the business as the result of the sale of the stock.

There is some suggestion that, in the purchase of various restaurant businesses, taxpayer acquired valuable good will, but there is an utter absence of any proof that such was the case. The claim is also made that excessive depreciation was taken in prior years, but there is an absence of any proof of the cost of the property depreciated, the period of its useful life, the rate of depreciation written off, or any other facts from which we might determine whether or not such a claim is justified.

Taxpayer urges that special assessment was given in 1917 and 1918, and that there is no proof of changed conditions in 1919. We do not consider this sufficient, especially in the absence of any proof of the circumstances in which special assessment was granted in those years and affirmative proof that these conditions existed in the year in question.

Nor are exceptionally high earnings sufficient, for section 327 (d) provides that such subdivision shall not apply to any case in which the tax is high merely because the corporation earned a high rate of profit upon a normal invested capital. The taxpayer having shown no abnormal condition affecting its capital or its income (all of which was derived from the conduct of the regular business of the taxpayer), and not having brought itself within any of the exceptions set out in section 327 of the 1918 Act, it is not entitled to have its tax for 1919 computed under section 328 of that Act.

For the year 1918, it is taxpayer's contention that the Commissioner, having determined that it is entitled to the computation of its tax under section 328, failed to compare the taxpayer with representative corporations whose invested capital can be satisfactorily determined, and which are, as nearly as may be, similarly circumstanced with respect to gross income, net income, profits per unit of business transacted, and capital employed, the amount and rate of war profits or excess profits, and all other relevant facts and circumstances.

There is nothing to show what comparatives were used by the Commissioner, but the taxpayer has attempted to overcome this by

showing that the White Lunch Co. is the only corporation which can serve as a comparative.

The testimony of one of the taxpayer's employees, a manager of one of its restaurants, was to the effect that he was familiar with the business of chain restaurants east of the Mississippi River, had traveled throughout most of that section, and that in his opinion there was no corporation conducting a business such as the taxpayer's and comparable with it in methods of service, classes of patrons, number of restaurants, etc., except possibly the Boston Dairy Lunch, operating in Detroit and Baltimore; furthermore, that prices in the East were much higher than in the neighborhood of San Francisco and portions served in the East much smaller. Child's restaurants were distinguished from taxpayer's on the ground that they were not self-service, served a better class of patrons, charged higher prices and operated more restaurants. Thompson's were distinguished on some of the same grounds.

The testimony of taxpayer's president was much to the same effect, and he further testified that he was familiar with the restaurants on the Pacific coast and that none were comparable with taxpayer in number of restaurants operated, prices charged, method of service, and class of persons served.

Taxpayer also established that the John R. Thompson Co., Inc., which operated over 100 Thompson's Dairy Lunches, had outstanding in 1918 capital stock of $5,725,000 and a book surplus of over $2,000,000, and that the Waldorf System, Inc., operating a chain of approximately 75 restaurants, had outstanding on May 31, 1919, capital stock of $3,006,100.

Assuming that taxpayer has shown that the corporations operating the Thompson, Waldorf, and Child's chains of restaurants can not properly be used as comparatives, and that it has been successfully shown that there is no other corporation operating a chain of restaurants, other than the White Lunch Co., comparable with taxpayer in fixtures, fittings, method of service, classes of patrons, kinds and varieties of food served, prices charged, and size of portions served, has it established its right to have its tax computed by comparison with the White Lunch Co.? We conclude that it has not.

Section 328 (a) directs that the comparison shall be with those representative corporations engaged in a like or similar trade or business which are, as nearly as may be, similarly circumstanced with respect to gross income, net income, profits per unit of business transacted, and capital employed, the amount and rate of war profits and excess profits, and all other relevant facts and circum-

stances. The evidence was confined principally to an attempt to show that there was no corporation other than the White Lunch Co. comparable with taxpayer in respect to class of persons served, prices, location, method of service, etc., and was not directed to a showing that there were no other corporations comparable with respect to the items enumerated in the statute. This evidence appears to have been for the purpose of showing that other restaurants were not " representative."

In order that a corporation may be representative, we do not conceive that its business must be identical in all respects with that of the taxpayer. The fact that a corporation operating a chain of restaurants may serve a somewhat different class of patrons, may charge higher prices or serve larger portions than the taxpayer, does not, in our opinion, exclude it from the class of representative corporations for comparison with the taxpayer so long as its business is substantially the same as that of the taxpayer and it meets the other requirements of the statute. The taxpayer has failed to establish any lack of proper comparatives within the statutory definition, and on this ground alone it would be necessary to approve the determination of the Commissioner.

But it further appears that the White Lunch Co., the only corporation concerning whose income any information was introduced, and taxpayer are not similarly circumstanced in the respects set out in the statute. From the findings we make the following tabulation of the two corporations for 1918:

|  | Gross income. | Net income. | Profits per unit of business transacted. |
|---|---|---|---|
|  |  |  | *Per cent* |
| White Lunch Co | $609, 646. 29 | [1] $2, 604. 11 | [1] 0: 43 |
| Taxpayer | 1, 384, 913. 94 | [2] 72, 799. 84 | [2] 5. 21 |

[1] Loss.                    [2] Gain.

The testimony does not show either the amount determined by the Commissioner to be the capital employed by the White Lunch Co. in 1918 or the amount of excess profits or war profits of the taxpayer for 1918, and no comparison in these respects can be made. But it is clear that so far as the comparison directed by the statute can be made the two corporations are not similarly circumstanced.

ARUNDELL not participating.